**SURDYK'S LIQUOR, INC., a Minnesota corporation, Plaintiff,**

v.

**MGM LIQUOR STORES, INC., a Minnesota corporation, Defendant.**

**No. Civ. 99–1953 (DSD/JMM).**

United States District Court, D. Minnesota.

Feb. 9, 2000.

Richard A Duncan, Elizabeth Hendricks Schmiesing, Michael D Beach, Faegre & Benson, Minneapolis, MN, for Surdyk's Liquor Inc.

Alan Marshall Anderson, C Eric Hawes, Larkin Hoffman Daly & Lindgren, Bloomington, MN, for MGM Liquor Stores, Inc.

## ORDER

DOTY, District Judge.

This matter is before the court on (1) the parties' cross-motions to supplement the record and (2) plaintiff's motion for preliminary injunction. Based on a review of the file, record, and proceedings herein, the court (1) grants the parties' cross-motions to supplement the record and (2) grants plaintiff's motion for preliminary injunction.

## BACKGROUND

Plaintiff Surdyk's Liquor, Inc. ("Surdyk's") and defendant MGM Liquor Stores, Inc. ("MGM") are rival Twin Cities wine and liquor retailers. Surdyk's owns and operates a liquor store in Northeast Minneapolis. MGM is the franchisor for a chain of 36 area liquor stores operating under the name "MGM Liquor Ware-

house." The individual MGM stores are owned and operated by six different franchisees. As part of the franchise relationship, defendant MGM orchestrates joint advertising campaigns when the MGM store owners decide to conduct a coordinated sale.

In the fall of 1999, MGM published a multiple-page advertising flyer for a wine and liquor sales event called the "29th Anniversary Wine, Liquor & Beer Sale." Twenty-three MGM stores were advertised as participating in the event, which was scheduled to run from September 30 through October 20, 1999. The flyer was published by the Star Tribune and circulated widely throughout the Twin Cities metropolitan region. On September 29, 1999, the day before the sale was to begin, three private investigators hired by Surdyk's visited ten different MGM stores and attempted to purchase case quantities of 18 wines advertised for sale in the Anniversary Sale flyer. The investigators found that at each of the MGM stores surveyed the wines requested were either out of stock or stocked in very small quantities. At about half of the stores, an MGM employee stated that the requested wines could be specially ordered and delivered within two days to a week.

On October 8, 1999, Surdyk's filed a complaint with the Minnesota Attorney General's Office about MGM's advertising in connection with the Anniversary Sale. On October 14, 1999, the Attorney General's Office sent a letter to MGM, reminding MGM that several Minnesota statutes prohibit false or deceptive advertising and that "[t]he State is empowered to seek an injunction, restitution, civil penalties and attorneys' fees in the event your company violated these statutes." Letter from Erik A. Lindseth, Assistant Attorney General, to MGM (Oct. 14, 1999) (Beach Aff., Ex. C.) The letter also stated:

> The state hereby requests that you respond immediately to this complaint. In particular, please provide evidence that the wines referenced above were available during the sale, and in what quantities they were available. . . . .
>
> If the wines referenced above were not available at the outset of the sale or have not been available in reasonable quantities throughout the sale, the State requests that you cease further use of your "29th Anniversary" print advertisements for the remainder of the sale, and reconsider your use of such advertisements in future sales.

*Id.* On October 21, 1999, MGM responded to the letter from the Attorney General's Office with the following explanation:

> When MGM prepared its advertising circular (and sales of this nature are planned more than a month in advance), it listed for sale only products which appeared on price lists distributed by its suppliers. In response to your letter, MGM confirmed with its suppliers that all the wines listed in your letter were available at the time this advertising circular was prepared. It would not be unusual, however, when dealing with wines of limited availability, for there to be some wines that are not available at a subsequent date. In this case, apparently only 4 of about 1,000 wines listed in the advertisements were not available at the time checked by Surdyk's representative.

Letter from Charles S. Modell, Counsel for MGM, to Minnesota Attorney General's Office, at 2 (Oct. 21, 1999) ("MGM Letter") (Beach Aff., Ex. D).

In November 1999, MGM again prepared a multiple-page flyer to be published in local newspapers in connection with another sales event, "The Millenium Holiday Wine, Liquor & Beer Sale." The Millennium Sale involved 33 MGM stores and was scheduled to run from November 29 through December 11, 1999. On November 30, 1999, Surdyk's sent an investigator to visit a number of participating MGM stores using a list of two dozen wines and liquors. Again, the investigator found that, for the most part, the products requested were either out of stock or stocked

in small quantities. Again, the employees at many of the MGM stores suggested that the items could be special ordered and delivered within two days to a week.

On November 24, 1999, Surdyk's filed a complaint in Hennepin County District Court alleging that the MGM flyers constitute false advertising in violation of section 43(a) of the federal Lanham Act (codified at 15 U.S.C. § 1125(a)); the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.44; Minn.Stat. § 325F.67 (prohibiting false advertising), and Minn.Stat. 325F.69 (prohibiting consumer fraud). On December 6, 1999, MGM removed the complaint to federal court. Surdyk's now moves for a preliminary injunction. The parties also bring cross-motions to supplement the record with material not submitted to the court during briefing of the preliminary injunction motion.

### DISCUSSION

#### A. Cross–Motions to Supplement the Record

■ The parties have brought cross-motions to supplement the record with affidavits from local consumers who have recently attempted to purchase wine from MGM and Surdyk's. Because the parties have adequately explained why they did not include these materials with the original motion papers, and because these materials shed helpful light on the merits of plaintiff's false advertising claim, the court will grant the cross-motions.

#### B. Mootness and Party Joinder

■ MGM makes two threshold arguments in opposition to the motion for preliminary injunction by Surdyk's. First, MGM contends that the dispute is moot in light of the fact that the Anniversary and Millennium Sales have now ended. As the Supreme Court recently stated, however, "[i]t is well-settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its

power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* —— U.S. ——, ——, 120 S.Ct. 693, 708, —— L.Ed.2d —— (2000) (citing *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). Moreover, while a defendant's voluntary cessation "is an important factor bearing on the question of whether a court should exercise its power to enjoin defendant," *City of Mesquite,* 455 U.S. at 283, 102 S.Ct. 1070, *see also LensCrafters, Inc. v. Vision World, Inc.,* 943 F.Supp. 1481, 1497 (D.Minn.1996) ("[T]he need for injunctive relief is obviated when the party accused of using false or misleading advertising represents that the advertisements will not be repeated."), MGM has given no indication to the court that it intends to halt or modify its past advertising practices from this point forward. Indeed, MGM's decision to publish the Millennium flyer even in the face of a false advertising complaint by Surdyk's and a cautionary letter from the Minnesota Attorney General's Office suggests just the opposite. Given these circumstances, the court concludes that neither the present action nor the pending motion for preliminary injunction is moot.

■ Second, MGM contends that the court cannot order the injunctive relief requested because Surdyk's has failed to join the six MGM franchisees who separately control the inventory at the 36 MGM stores. This argument ignores the critical point, however, that the Surdyk's suit is specifically directed at MGM's advertising practices, not its inventory control procedures. And it is undisputed that MGM, rather than its franchisees, is responsible for "manag[ing] an advertising fund" and "conduct[ing] advertising in the best interests of all of its franchisees." *See* Maglich Aff. at ¶ 4; *see also* Setter Aff. ¶¶ 2, 3 (describing the "internal time and effort" expended by MGM in "put[ting] together an advertising circular listing the products that would be included" in both sales). Accordingly, the court

concludes that joinder of the MGM franchisees is not a prerequisite to the issuance of the injunctive relief sought here.

## C. Preliminary Injunction

■■■ Surdyk's brings a motion for preliminary injunction, asking the court to enter an order halting MGM's alleged false advertising practices. In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. CL Systems, Inc.*: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. 640 F.2d 109, 112–114 (8th Cir.1981). The court weighs the four factors to determine whether injunctive relief is warranted. *See id.* at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The plaintiff bears the burden of proof concerning each of them. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

### 1. Lanham Act Claim: Likelihood of Success on the Merits

■■■ Surdyk's brings a claim under section 43(a) of the Lanham Act based on MGM's alleged practice of advertising for sale wines and liquors that are unavailable in the supplies advertised. Congress enacted the Lanham Act to protect persons engaged in commerce against certain forms of unfair competition, including false or deceptive advertising. *See Unit-*ed *Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1179. Section 43(a)(1)(b) of the Lanham Act prohibits "commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of [the advertiser's] or another person's goods, services, or commercial activities." As courts have noted, "[w]hether a product is available goes directly to one of that product's characteristics." *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F.Supp. 360, 368 (S.D.Fla.1996).[1] Further, the Federal Trade Commission ("FTC"), the administrative agency charged by Congress with preventing unfair competition, *see* 15 U.S.C. §§ 45, 46, has promulgated a regulation stating that "no advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product." 16 C.F.R. § 238.1. The FTC suggests that an advertised offer will not be considered bona fide when it "fail[s] to have available at all outlets listed in the advertisement a sufficient quantity of the advertised product to meet reasonably anticipated demands, unless the advertisement clearly and adequately discloses that supply is limited and/or the merchandise is available only at designated outlets." *Id.* § 238.3(c). Thus, under the plain language of the statute and the FTC's advertising regulations, MGM's alleged conduct would appear to fall squarely within the ambit of the Lanham Act. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 973 (7th Cir.1999) ("[A]s the administrative agency charged with preventing unfair trade practices, the [FTC's] assessment of what constitutes deceptive advertising commands deference from the

---

**1.** The court cannot agree, however, with the unsupported assertion in *Tire Kingdom* that Lanham Act claims based on a product's claimed availability are "limited to cases of intentional, constant, unavailability as opposed to 'bait and switch' claims." 915 F.Supp. at 368. The court believes that a per se rule of this kind is inappropriate given (1) the plain language of section 43(a), which prohibits any advertisement that misrepresents the quality or character of the advertised goods, and (2) the FTC false advertising regulations prohibiting "bait advertising." *See* 16 C.F.R. §§ 238.0–238.4. The better approach is to analyze a plaintiff's false advertising claims under the standard elements of falsity, consumer deception, and materiality discussed below.

judiciary.").[2]

▮▮▮▮ To prevail on a false advertising claim under section 43(a), a plaintiff must prove (1) that defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) that the statement actually deceived or would tend to deceive a substantial segment of its audience; (3) that the deception is material, in that it is likely to influence the purchasing decision; (4) that defendant caused its false statement to enter interstate commerce; and (5) that the plaintiff has been or likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a loss of good will associated with its products. *See United Industries*, 140 F.3d at 1179. "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter, and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* If a plaintiff establishes that the defendant's commercial claim is literally false, the court may grant injunctive relief without considering the advertisement's actual impact on the consuming public. *See id.; McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) ("Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'" (citation omitted)); *Genderm Corp. v. Biozone Labs.*, 1992 WL 220638 *2 (N.D.Ill.1992) (holding that explicitly false statements are presumed to be material).

### a. Literal Falsity

The court's first task is to assess whether Surdyk's is likely to prove that the commercial claims contained in MGM's sale flyers are literally false. The court will discuss the standard for analyzing literal falsity before applying that standard to the facts of this case.

### (1) Standard for Assessing Literal Falsity

▮▮▮▮ The court's assessment of literal falsity involves a two-stage inquiry: (1) whether the challenged advertisement conveys an explicit factual message, and (2) whether that explicit factual message is false. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 27:55–56 (separating the falsity analysis into two stages: (1) "determining the message of the advertisement" and (2) "proving falsity"); *United Industries*, 140 F.3d at 1181 (approving the analytical approach of the lower court, which had "[first] determined that the ... commercial conveyed an explicit message ... and [then] found that this message was literally untrue."). The Eighth Circuit has recently discussed the considerations that should inform an analysis of literal falsity:

> In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context. In some circumstances, even a visual image or a visual image combined with an audio component, may be literal-

2. That being said, the court believes it would be inappropriate to focus too narrowly on the FTC regulations when evaluating the question of MGM's liability under the Lanham Act. In *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222 (3d Cir.1990), the Third Circuit declined a private Lanham Act plaintiff's "invitation to blur the distinctions between the FTC and a Lanham Act plaintiff," on the grounds that such an approach "would require [court's] to ignore the separate jurisprudence that has evolved under each Act, and the sound reasoning that underlies it." *Id.* at 230. The *Sandoz* court held that the Lanham Act plaintiff must "show that the [advertisements] are literally false or misleading to the public," not merely that the advertisements violate FTC guidelines. *Id. See also Sanfield*, 168 F.3d at 972 n. 3 (although administrative regulations entitled to deference, liability under the Lanham Act ultimately hinges on whether plaintiff has proved the standard elements).

ly false. The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.

*Id.* at 1180–81 (citations omitted). The issue of literal falsity, including the "interpretation of [a] commercial's message," is "a classic question of fact" that is "highly dependent upon context and inference." *Id.* at 1183.

### (2) MGM Advertisements

Surdyk's has directed its Lanham Act claim at the two advertising flyers published by MGM in connection with MGM's Anniversary and Millennium Sales. The two flyers employ almost identical formats. Across a multiple-page booklet, MGM individually lists the hundreds of wine, liquor, and beer products that are being offered for sale. The vast majority of the items carry the following information: a capsule editorial description; a stock item number; the ordinary retail price per bottle; the sale price per bottle; the sale price per case. Next to a few of the wines, the word "limited" appears in the space normally containing the sale price for cases. In the back of each flyer is a page of maps showing the location of participating MGM stores. The Anniversary Flyer contains the following disclaimer, which appears in fine print on the second page of the booklet:

> Traditionally, MGM Liquor Warehouse makes every effort to insure availability of all items that are on sale, throughout the sale period. However, with a sale of this size and the very limited availability of some of these outstanding wines (in some instances only a few cases), we think it['s] important to offer the consumer the chance to purchase these and other fine products in this 29th Anniversary Sale on a first come first served

basis. Thus we may run out quickly on some items and/or vintages. Keep in mind that availability does change throughout the year, so be sure to check in with MGM periodically for availability of the world's outstanding wines. Also note that MGM Liquor Warehouse has taken the utmost care in preparing the Anniversary Sale, but we are not responsible for typographical errors. No additional discounts may be applied to sale products. All bottles are 750ml, and are packed 12 bottles to a case unless otherwise noted.

Anniversary Flyer at 2 (Beach Aff., Ex. B). The Millennium flyer contains a disclaimer with almost identical language but also adds the following parenthetical sentence to the middle of the paragraph: "Supplier shortages may also affect the availability of some products and vintages." Millennium Flyer at 2 (Beach Aff., Ex. A). The Millennium flyer also carries the following disclaiming language at the bottom of two pages: "MGM and/or our suppliers may run out without notice on some items and/or vintages." Millennium Flyer at 3, 16. Finally, both flyers attach order forms that carry similar disclaimers in very fine print at the bottom of the form, as well as a statement that customers using the form should "allow[ ] a minimum of 48 hours" before picking up their orders. *See* Anniversary Flyer & Millennium Flyer (attached order forms).

### (3) Literal Falsity of the MGM Advertisements

The parties disagree as to the explicit message conveyed by the MGM flyers. Surdyk's contends that these flyers, on their face, represent to the buying public that MGM has the advertised products immediately available at sale price, at each participating location, by the case and by the bottle. This representation, Surdyk's argues, is false. MGM, on the other hand, contends that the flyers, on their face, merely represent that the advertised products are generally available at sale price,

with no express message that MGM stores will stock either bottles or cases of the products. This representation, MGM argues, is true. Although the court believes that Surdyk's is likely to prove literal falsity under either interpretation of the MGM advertisements, the court will address each interpretation separately.

### a. "Immediate Availability"

Surdyk's argues that the MGM flyers explicitly convey a message of immediate availability. The court agrees. First, the detailed listing of the wine and liquor products, complete with individual stock item numbers, signifies that MGM actually carries each of the sale items in inventory. Second, the specific listing of case sale prices next to most of the wine and liquor listings signifies that MGM has case quantities of the items in inventory. Third, the individualized store maps signify that each participating store had ready access to the inventory advertised in the flyers. Viewed together in context, then, the textual elements of the MGM flyers convey a clear message that the sales items are available at each participating MGM store for immediate purchase, in both bottle and case quantities.

This message is reinforced by the disclaimers that appear in both flyers. The disclaimers begin by stating that "MGM Liquor Warehouse makes every effort to insure availability of all items that are on sale" but warns about "the very limited availability of some of these outstanding wines (in some instances only a few cases)." The plain, ordinary meaning of "available" is "present or ready for immediate use." *See* MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY,

TENTH EDITION, at 79. Thus, the very use of the term "availability" in the disclaimer strongly connotes that MGM stores carries an immediately accessible quantity of almost all advertised products in stock. This understanding is underscored by other statements in the disclaimer: that "in some instances," availability is limited to "only a few cases"; that supplies are available on a "first come first serve" basis; that MGM may "run out" if the consumer does not act quickly. Each of these statements indicate that MGM has at least some case quantities in actual inventory at the beginning of the sale. Likewise, the fact that MGM specifically denominates a few wines as "limited" in the main text of the flyers suggests: (1) that MGM nonetheless has a determinate amount of those wines on hand and (2) that bottle and case quantities are not limited with respect to the hundreds of remaining advertised wines.[3]

 Thus, the court believes it likely that a factfinder would conclude that the MGM flyers convey a clear message that MGM stores stock an immediately available supply of each product advertised in the quantities advertised. The undisputed evidence demonstrates, however, that this message is false. While shopping at certain MGM stores during both the Anniversary and Millennium Sales, private investigators hired by Surdyk's discovered that a number of wines advertised in the flyers were either completely out of stock or stocked only in small bottle quantities. *See generally* Ness & Shaw Affs. & Attached Notes. Immediately prior to the commencement of the Anniversary Sale in September, investigators visited ten MGM

---

**3.** As noted, there is an additional parenthetical sentence inserted into the Millennium flyer disclaimer: "Supplier shortages may also affect the availability of some products and vintages." Millennium Sale Flyer (Beach Aff. A), at 2. Further, two pages of the main text in the Millennium flyer contain the following sentence: "MGM and/or our suppliers may run out without notice on some items and/or vintages." *Id.* at 3, 16. Finally, both flyers contain an order form that tells customers using the form that they should "allow[ ] a minimum of 48 hours" before picking up the order. However, these additional disclaimers, obscurely placed and vaguely worded, do nothing to correct the explicit message conveyed by the flyer that a determinant quantity of each of the wines listed is in stock at MGM stores at the outset of the sale.

stores with a list of 18 advertised wines, all but one of which had been advertised as available by the case. The Hilltop store stocked not a single bottle from the investigators' list. The West Bloomington, Crystal, and Maplewood stores had only one bottle from the list. The Blaine store stocked only "a couple bottles." The Eagan store had only three bottles. Stock was little better at the Coon Rapids, Brooklyn Park, and White Bear Lake stores. Only the Vadnais Heights store had a single wine available by the case. However, even this store stocked only seven of the eighteen wines on the list. Indeed, the manager at Vadnais Heights admitted to the investigator that MGM does not always stock all of the products in its advertisements.

Further, on the second day of the Millennium Sale in November, a private investigator hired by Surdyk's surveyed nine MGM stores,[4] including several stores not surveyed during the Anniversary Sale. On this occasion, the investigator shopped using a list of two dozen wines and liquors. The results were not significantly different from those of the first investigation. Five of the wines were entirely unavailable at all nine of the stores sampled. Three stores had none of the wines and none of the liquors on the investigator's list. Only two stores, Vadnais Heights and Minnetonka, had any of the wines in case quantities. The Vadnais Heights store had one case each of three of seventeen wines requested and the Minnetonka store had only one case.

Surdyk's directs the court to an especially telling example of the disconnect between MGM's advertised availability and its actual in-store availability. On the cover of the Millennium Flyer, MGM chose to feature a popular California Chardonnay, Far Niente. The entry for Far Niente appears on page 22 of the flyer, listing Far Niente's stock item number, its compara-

ble bottle price, and sales prices for both bottles and cases. On the second day of the Millennium Sale, however, Far Niente was entirely unavailable at the three MGM stores in Hilltop, Crystal, and Oak Park Heights. The MGM stores in Vadnais Heights, Minnetonka, Maple Grove, Plymouth, White Bear Lake, and St. Paul had only 20 bottles of Far Niente between them. Far Niente was similarly unavailable from the ten stores shopped during the Anniversary Sale.

In short, there is ample undisputed evidence that MGM stores across the Twin Cities failed to stock a number of advertised wines in case quantities or even significant bottle quantities. Because the actual inventory in these MGM stores directly contradicts MGM's advertised claims, the court concludes that Surdyk's is likely to succeed in proving that the MGM flyers are literally false.

### b. "General Availability"

MGM disagrees, however, that its sale flyers convey any message about immediate availability. Rather, MGM contends, the flyers merely communicate that the sales items are generally available, without any specific message as to whether the items are actually carried on store shelves. As discussed, the court does not believe that MGM's interpretation is correct. However, even if the court were to adopt this interpretation, the record evidence strongly supports a finding of literal falsity. Surdyk's has clearly demonstrated that a number of the sales items were unavailable even from distributors during the relevant sale periods. Jim Surdyk, the owner of Surdyk's, and Mike Cords, the wine manager at Surdyk's, have submitted affidavits stating that, based on their personal experience in the wine and liquor retail industry and a perusal of the MGM Flyers, "numerous" wines and liquors advertised by MGM "were not available in

---

4. The investigator actually visited a tenth MGM store in Maplewood but was unavailable to gather actual inventory information.

Twin Cities distribution channels, and not in the case lots advertised." Cord Aff. at ¶ 3; *see also* Surdyk Aff. ¶ 5. Further, the private investigation conducted by Surdyk's confirms that several products were completely unavailable in case quantities from any of the MGM stores shopped during the Anniversary and Millennium Sales. This evidence of persistent retail unavailability strongly supports the inference that these products were not available at the wholesale level either.

Indeed, the evidence of distributor unavailability for certain advertised wines goes well beyond the testimony of Surdyk's employees and investigators. As MGM itself admitted in its letter to the Minnesota Attorney General, four of the wines advertised in the Anniversary flyer were not available from distributors during the sale period. *See* MGM Letter at 2. In the same letter, MGM acknowledged that "it would not be unusual, . . . when dealing with wines of limited availability, for there to be some wines that are not available [from distributors] at a [date] subsequent [to the publication of the sale flyer]." *Id.* Further, Mark Jenkins, an MGM customer, has submitted an affidavit describing his efforts to obtain three bottles of Domaine Chandon Fleur de Vigne, an item advertised for sale on the second page of the Millennium flyer. *See generally* Jenkins Aff. After traveling to MGM's Woodbury store during the sale and asking to purchase the wine, Jenkins was told by a salesperson that "Fleur de Vigne is a special order item" and informed that it would take two to three days for an order to arrive. *Id.* at ¶ 10. A week later, having heard nothing from MGM, Jenkins called to inquire about the status of the wine. He was told by the Woodbury store manager that the "[MGM] distributor was out of stock" until the next week. *Id.* at 13. Jenkins twice followed up with calls to MGM, but each time was told that the distributor remained out of stock.[5] Jen-

kins's experience obviously calls into doubt the accuracy of MGM's claims about distributor availability.

In response to this evidence, MGM offers virtually identical affidavits from three MGM employees averring that, prior to each sale, MGM "personally contacted MGM's wholesale suppliers and distributors . . ., in order to confirm that all of the wines listed in the advertisement would be available from our suppliers and distributors at the beginning of the sale." Mills Aff. ¶¶ 3, 5 (confirming wine supply); Hanson Aff. ¶¶ 3, 5 (confirming liquor supply); Raney Aff. ¶¶ 3, 5 (confirming beer supply). Notably absent from these affidavits, however, is any specific mention of when these suppliers were contacted and what quantity of merchandise MGM was able to confirm as available. These affidavits also appear to partially contradict another statement by MGM that it confirmed supplier availability only after the Anniversary Sale was finished. *See* MGM Letter at 2 ("*In response to your letter,* MGM confirmed with its suppliers that all the wines listed were available [from distributors]." (emphasis added)). Further, the affidavits describe only half-hearted attempts to confirm availability in the first place: MGM merely "informed our suppliers and distributors which wines we planned to list in the advertisement, and asked them to contact [MGM] if any of the proposed products would not be available." Mills Aff. ¶ 5; Hanson Aff. ¶ 5; Raney Aff. ¶ 5. While MGM argues that its efforts were adequate to the task of ensuring availability, the record evidence clearly indicates otherwise.

Indeed, MGM's passive relationship with its suppliers highlights the fundamental problem with its conduct in this case. In its motion papers and at oral argument, MGM has repeatedly acknowledged that it has no control over the stock or inventory

5. More than two weeks after his initial request, twelve days after the close of the Millennium Sale, and one day after he had

submitted his affidavit in this case, MGM informed Jenkins that his wine had arrived from the distributor.

control procedures of any MGM franchisee. MGM has also acknowledged the unique supply difficulties associated with the wine business:

> In the case of wines, you are not dealing with a product that is manufactured in unlimited quantities. New wines represent an agricultural product whose supply is limited by matters beyond anyone's control, including the size and quality of the annual grape crop. Older wines are obviously limited to the number of bottles previously produced. Supplies are therefore always limited, and it is impossible to know in advance when a wholesaler's demand will exceed supply.

MGM Letter, at 2. Yet in spite of the inherently uncertain nature of wholesale wine supply and MGM's passive, decentralized approach to inventory control, MGM has twice orchestrated advertising campaigns that belie these business realities and the availability problems they inevitably create. While MGM and its franchisees may manage their inventory in any way they like, they may not misrepresent the actual nature of that inventory to the buying public. Because there is strong evidence that just such a misrepresentation has occurred, the court concludes that Surdyk's is likely to succeed on the issue of literal falsity.

### c. The Remaining Elements of the Lanham Act Claim

█ Because Surdyk's has shown that it is likely to prove literal falsity, the court need not consider the elements of the Lanham Act claim addressing actual consumer impact. *See United Industries,* 140 F.3d at 1179.[6] However, it is appropriate to point out that Surdyk's has offered substantial evidence that the buying public was actually and materially deceived by the MGM advertisement. Kevin Ries and Mark Jenkins, local wine consumers who read about the present lawsuit in the newspaper, have submitted affidavits in which they aver that the flyers (1) led them to believe that specific advertised items were available for immediate purchase at MGM stores, (2) enticed them into traveling to MGM stores to purchase these items, (3) and caused them ultimately to purchase merchandise different from that requested. *See* Ries Aff. at ¶ 6 ("I understood MGM's [Anniversary] flyer to mean that each of the wines advertised for sale was actually in stock and available for sale at each of the MGM stores listed."); *id.* at ¶ 14 ("I was deceived by MGM's advertising. I was angry and frustrated that I had driven all the way to MGM's Bloomington store to purchase a specific wine, relying on MGM's advertisement, only to find that MGM did not have any bottles of wine that I was seeking ... in stock."); Second Ries Aff. at ¶ 4 ("I was in their Bloomington store, needed some wine, and did indeed purchase wine I had not intended to purchase...."); Jenkins Aff. at ¶ 7 ("As a result of reading the MGM [Millennium] Flyer and believing that MGM had a wine in stock that I wanted to buy for several months, I went to the Woodbury store in early December (a few days before the end of the Millennium sale) to purchase three bottles of Domaine Chandon Fleur de Vigne."); *id.* at ¶ 17 (" I felt it was untruthful and misleading to advertise wines for sale which MGM did not have in stock at its stores...."); *id.* at ¶ 11 ("I purchased a box of Franzia White Zinfandel while in the store."). This affidavit testimony from two apparently sophisticated wine consumers supports a finding that a significant portion of the buying public would have been materially mislead by the MGM flyers. This finding, in turn, provides further support for the conclusion that Surdyk's is likely to prevail on its section 43(a) claim. *See United Industries,* 140 F.3d at 1183 ("At the preliminary injunction stage, ... full-blown consumer surveys or market research are

---

**6.** MGM does not dispute that Surdyk's can meet the interstate commerce requirement of the Lanham Act claim. With respect to the injury requirement, irreparable harm is presumed when a Lanham Act plaintiff proves literal falsity. *See infra* Part C.2.

not an absolute prerequisite, and ... other evidence may at times be sufficient to obtain preliminary injunctive relief [even] in cases involving implicitly false or misleading claims.").[7]

### 2. The Remaining *Dataphase* Factors

Because Surdyk's has demonstrated a strong prospect of success on the merits, the court will presume that Surdyk's has suffered irreparable harm from MGM's advertising practices. *See id.* ("When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm."); *Alternative Pioneering Systems, Inc. v. Direct Innovative Prods., Inc.,* 822 F.Supp. 1437, 1444 (D.Minn.1993) ("Irreparable harm is presumed for purposes of a preliminary injunction motion on a false advertising claim once the moving party establishes a likelihood that the disputed [advertisements] are false."). Moreover, there is no question that "the public interest favors enjoining false statements." *United Industries,* 140 F.3d at 1184. Indeed, Section 43(a) of the Lanham Act was "designed to protect the right of the consumer to be told the truth." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:25.

▆▆ On the other side of the scale, the court recognizes that an injunctive order by the court will place a considerable burden on MGM insofar as it requires the company to modify what it considers a very successful sales tactic. The court also recognizes that any order regulating the substance of a commercial advertisement runs the risk of trespassing on the advertiser's first amendment guarantees. However, as the Supreme Court has made

clear, MGM has no first amendment right to deceive the consuming public. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("The government may ban forms of communication more likely to deceive the public than to inform it."). And MGM may not legitimately claim economic harm when a court merely prohibits it from continuing to engage in conduct that violates federal law. Accordingly, after carefully weighing the *Dataphase* factors, the court will grant Surdyk's motion for preliminary injunction. The court will endeavor, however, to tailor the injunction so that it goes no further than necessary to correct the deceptive aspects of MGM's advertisements.[8]

### 3. Bond Amount

Under Federal Rule 65(c) the court is required to determine the amount of security that the preliminary injunction movant must give "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." MGM suggests that a one million dollar bond is appropriate in this case, apparently basing this figure on the assumption that the court's injunctive order will effectively preclude it from conducting franchise-wide wine advertisements. However, given the strong likelihood that Surdyk's will succeed on its false advertising claim and the fact that the court's order will prevent MGM from publishing potentially deceptive advertisements only, the court believes that the bond should be set at a much lower figure of $50,000.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

7. Having found that Surdyk's is likely to succeed on its Lanham Act claim, the court need not address the merits of its state law claims.

8. For example, because there is no evidence that beer supply was short during the sale periods, the court will not include the advertisement of beer products within the injunctive order. Also, the court will permit MGM

to conduct clearly denominated "special order" sales as long as MGM takes the steps necessary to ensure that the products advertised are available from distributors (1) within a reasonable time period and (2) in amounts sufficient to meet the reasonably anticipated consumer demand for the products at each and every participating MGM store.

1. The parties' cross-motions to supplement the record are granted.

2. Plaintiff's motion for preliminary injunction is granted.

3. Until further notice, MGM shall be enjoined from advertising specific wine or liquor products in bottle or case sale prices except under the following conditions:

a. MGM may advertise a bottle sale price for a specific product if each participating MGM retail store has in stock at least one case of the product on the first day of the sale period;

b. MGM may advertise both a bottle and a case sale price for a specific product if each participating MGM retail store has in stock at least two cases of the product on the first day of the sale period;

c. Even if these stock requirements are not met, MGM may advertise a specific bottle or case price if:

(1) The text associated with the specific product clearly states that the item is not available at all participating stores and clearly identifies the stores not meeting the stock requirements; or,

(2) The text associated with the specific product states that the product is available for "special order only," provided that MGM has received documented assurance from its distributors that each participating store will, during the relevant sale period, have access to the product (a) within a reasonable amount of time and (b) in a quantity sufficient to meet reasonably anticipated demands for the product at that store.

4. This injunction will not take effect until plaintiff posts a bond or provides other security in the amount of $50,000.