**Heidi OTT A.G. and Heidi Ott, Plaintiffs,**

v.

**TARGET CORPORATION; the Brass Key, Inc.; Unimax Toys Limited; Unimax Toys (USA), Inc.; and John Pellegrene; Defendants.**

**No. CIV 99–1170 (PAMJGL).**

United States District Court, D. Minnesota.

March 8, 2001.

Donald Wayne Niles, Norman M. Abramson, Patterson & Keough, Minneapolis, MN, for Plaintiffs.

John Bennett Gordon, James Robert Steffen, Kristin R. Eads, Faegre & Benson, Minneapolis, MN, Mark Joseph Chasteen, Michelle Bergholz Frazier, James Jenner McConnell, Dorsey & Whitney, Minneapolis, MN, Allen W. Hinderaker, Merchant & Gould, Minneapolis, MN, Valerie du Laney, C. Dean Little, Ashley Bale, Miller Nash Wiener Hager & Carlsen, Seattle, WA, D. William Toone, Mark S. Carlson, Dorsey & Whitney, Seattle, WA, John Allen Clifford, Kristina M. Foudray, Merchant & Gould, Minneapolis, MN, Larry L. Saret, Martin L. Stern, Rita A. Abbati, Kevin C. Trock, William A. Meunier, Laff Whitesel & Saret, Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on Defendants' Motions for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment. For the reasons that follow, the Court grants in part and denies in part each Defendant's Motion and denies Plaintiffs' Motion.

### BACKGROUND [1]

Plaintiff Heidi Ott ("Ott"),[2] a Swiss citizen, has designed and manufactured artisan dolls for many years. On November 2, 1982, Ott registered her mark, Heidi

---

**1.** The facts in this case are extensive and largely disputed. The Court will set forth only those facts specifically relevant to the Court's disposition of the matter.

**2.** Heidi Ott A.G., a Swiss corporation, is also

Ott®, with the United States Patent and Trademark Office (Reg. No. 1,215,011). Ott's handmade dolls range in price from $100 to several thousand dollars, and are primarily sold through small doll specialty shops catering to serious doll collectors. In 1989 she created her first line of mass-produced dolls, the Little Ones collection. The Little Ones dolls are 12 inch international dolls dressed in traditional costume. Although mass-produced, Ott maintains that these dolls retain the distinctive characteristics of her handmade dolls.

In June 1994, after noting the overwhelming success of The Pleasant Company's American Girl collection of mass-produced 18 inch vinyl dolls,[3] Ott began exploring the possibility of producing similar dolls for sale in the United States. Ott asked Julie Abdo ("Abdo"), an avid doll collector who resides in Minnesota, if she could help Ott cultivate business opportunities in the United States. Abdo eagerly accepted.[4]

In August 1994, Ott and her son, Karl, traveled to Minneapolis to meet with Abdo, whereupon they were introduced to Abdo's longtime friend Defendant John Pellegrene ("Pellegrene"), Executive Vice President of Target. Pellegrene, the Otts, and Abdo discussed the possibility of collaborating on a project involving traditionally dressed 18 inch vinyl dolls that would be priced under $40.00. Although at the time of Ott's meeting with Pellegrene, Target sold a small selection of porcelain dolls, its arrangement with Ott would signal its first real foray into the collectible doll market.

During the meeting, Pellegrene also expressed an interest in Ott's 12 inch Little Ones dolls for a project with Disney cen-

tered on the "It's a Small World" theme. According to Ott, Pellegrene indicated that one million dolls would be needed for the Disney project. Believing that they were to be used to further negotiate the Disney project, Ott left samples of her Little Ones dolls and doll clothing with Pellegrene. In fact, the samples were shown to a sales representative of Defendant Unimax, Michael Boe, for the alleged purpose of creating lower quality knock-off dolls, the "Dolls of All Nations." (Boe Dep. at 71, 77–81, 85–86.)

In March 1995, Ott returned to Minneapolis with samples of her newly created 18 inch dolls. Target was pleased with the samples, and the parties proceeded to discuss the details of their business relationship. Ott agreed to design and produce 6,000 18 inch vinyl dolls under the label "Best Friends" for a test market in a few dozen Target stores, with the understanding that more substantial orders would follow. Again, Ott left samples of her dolls in Minnesota with Target, and, again, Ott alleges that Target forwarded the samples to a competitor, this time Defendant Brass Key, for the purpose of making knock-offs. The alleged knock-offs of her 18 inch dolls were later sold exclusively by Target under the name "Liberty Landing."

In the fall of 1995, while perusing a "Target the Family" magazine containing an article about her and her new Best Friends collection, Ott noticed an advertisement for Unimax's Dolls of All Nations. Ott was immediately struck by the similarity between her Little Ones dolls and the Dolls of All Nations. Like her Little Ones collection, the Dolls of All Nations collection included 12 inch dolls dressed in tradi-

a Plaintiff in this case. (Compl. ¶ 1.) The Court will refer to Plaintiffs collectively as "Ott."

3. The American Girl collection includes doll accessories and story books relating to each

doll. Yearly sales reach approximately $150 million. (Abramson Aff., Ex. H6.)

4. Abdo ultimately acted as the sales representative for Ott in connection with all of her sales to Target. (Abdo Aff. ¶ 2.)

tional international costumes. In addition, Ott was concerned that the advertisement's proximity to the article about her created the impression that the Dolls of All Nations were made by her, particularly because the source of the dolls was not indicated on the advertisement.

In November 1995, Target ran a test market of Ott's Best Friends dolls in Chicago, Arizona, the Twin Cities. In conjunction with the test market, Target held doll signings in several Twin Cities stores. The test market was, by any standard, a success. Target customers began lining up 4–5 hours in advance of the Ott doll signings. Within hours, Target sold out of Ott's dolls at the stores that held doll signings. (Abramson Aff., Ex. H39, H67.) Sales also exceeded expectations in stores that did not hold doll signings. (*See id.* Ex. H33–36, H39.)

At a meeting with Target on December 4, 1995, Ott raised her concerns about the Dolls of All Nations collection, which had been introduced in Target stores nationwide just prior to the test market of Ott dolls. Ott advised that Target customers were presenting her with Dolls of All Nations at the signings believing that they were her creations. Ott specifically asked that Target instruct Unimax to destroy the molds used to make the Dolls of All Nations. (*Id.* Ex. H38.) In response, Target agreed not to sell the Dolls of All Nations in Europe, where Ott's Little Ones are particularly well-known. (*Id.*) In addition, Target promised that future Dolls of All Nations would not look similar to her Little Ones dolls. (*Id.*)

At the same meeting, Ott asserts that Target ordered 200,000 more Best Friends dolls for sales in Target stores nationwide. Thereafter, Ott expanded her manufacturing facility in China and began training the approximately 200 workers needed to manufacture 200,000 dolls per year. However, in July 1996, Target decreased the order to 75,000 dolls, allegedly because the test market did not go as well as expected. (*See* Target Mem. in Supp. Mot. for Sum. J. at 6 n. 1.) Although Target acknowledges that it had initially forecasted the need for 200,000 Ott dolls for 1996, it denies ever ordering or ever promising to order that amount for 1996 or any other year.

In the spring of 1996, Ott produced the 18 inch dolls, renamed "Faithful Friends," for sale in Target stores nationwide. At the same time, Target increased the number of porcelain dolls on its shelves and began selling collectible dolls from other manufacturers such as the Heritage Collection, Helmut Engel, and Danbury Mint. Target also added Brass Key's Liberty Landing collection to its product line at that time.

In the fall of 1996, Target expanded its collectible doll offerings to encompass the entire side of an aisle. Target's goal was to create a store-within-a-store by displaying the service mark "Collector's Lane" and a stylized "CL" logo across the entire aisle with street sign outriggers and shelf headers that suggested a row of quaint houses along the aisle. In addition, Collector's Lane included two glass front display cases-one displaying Barbie dolls and the other displaying Ott's Faithful Friends and Brass Key's Victorian Rose porcelain dolls. The display case containing Ott's Faithful Friends was marked with a cling-on placard incorporating the Collector's Lane mark and representing that the dolls contained therein were "Faithful Friends by Heidi Ott." The placard also incorporated a picture of Ott and descriptions of her Faithful Friends dolls.[5]

Ott first saw the Liberty Landing dolls when she returned to the United States in

---

5. Specifically, the placard includes the following description of Faithful Friends:

Designed by famous Swiss doll maker Heidi Ott

the winter of 1996 for a Target-sponsored promotional tour. Ott claims that she became immediately concerned upon seeing the dolls. She suspected that, as with her Little Ones dolls, her Faithful Friends dolls had been copied. In addition, Ott was distressed by the fact that Liberty Landing dolls were intermingled on the shelves with Faithful Friends dolls and that some Liberty Landing dolls had actually been placed in the glass case behind the Ott placard. (*See* Ott Dep. 790–93, 785–87, 841–42; Abdo Aff. ¶ 14.) Ott, her son, and Abdo discussed the problem with Pellegrene, who promised to investigate the matter. (*Id.*) According to Ott, when they also discussed the problem with Target buyer Joe Fusaro, he became defensive and retorted that Target could place merchandise on its shelves as it wished. (*See* Abdo Aff. ¶ 14.) Target did not responded to Ott's allegations regarding the Liberty Landing dolls until March 1997, at which time Target denied having any knowledge that the dolls were knock-offs of Ott's dolls. Target suggested that Ott contact Brass Key directly.

Target maintains that although it vigorously marketed Ott's Faithful Friends collection, the dolls simply did not meet sales expectations. As a result, in the fall of 1997, Target ordered only 10,000 Faithful Friends dolls. By October 1998, Target had decided not to purchase any more dolls from Ott, although Ott was not informed of that decision until December 1998. No Ott dolls were shipped to Target in 1999, and Target sales of Ott dolls ended by mid–1999. In total, Target sold approximately $4.8 million worth of Ott dolls and accessories.

On July 29, 1999, Ott commenced this lawsuit against Target, Pellegrene, Unimax, and Brass Key alleging trademark dilution, Lanham Act unfair competition, common law unfair competition, deceptive trade practices, unlawful trade practices, and unjust enrichment and quantum meruit by all Defendants; and trademark infringement, false advertising, violation of publicity rights, and promissory estoppel by Target and Pellegrene (collectively "Target"). These claims are based on three primary theories: (1) Target induced Ott's participation by false representation; (2) through Target, Brass Key and Unimax misappropriated Ott's Little Ones and Faithful Friends doll designs; and (3) Target improperly used Ott's name, likeness, and trademark to market non-Ott dolls and to promote its Collector's Lane line of dolls, furniture, and clothing. For their part, Defendants raise the affirmative defenses of laches, equitable estoppel, and the doctrine of acquiescence and/or waiver.

In November 1999, Ott moved for a preliminary injunction to enjoin Target from using, posting, or displaying placards featuring Ott, her trademark, or her photograph, after learning that some Target stores had failed to remove such placards even though Ott dolls were no longer being sold there. On December 3, 1999, this Court granted the injunction. Defendants now move separately for summary judgment on all counts contained in the Complaint and Ott moves for partial summary judgment on Defendants' asserted affirmative defenses, on her claim against Target for false advertising and violation of her right to publicity, and on the validity of her trademark.

## DISCUSSION

### A. Standard

Summary judgment is proper if there are no disputed issues of material fact and

Double-stitched, layered clothing
Beautiful hand-painted facial features
Comes with certificate of authenticity

Limited edition
(Civello Aff. Ex. W.)

the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir. 1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quotation omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

**B. Unimax's and Brass Key's Motions**

*1. Trade Dress Infringement*

■ In Counts III–VI of the Complaint, Ott alleges that the overall appearance of Brass Key's Liberty Landing dolls and Unimax's Dolls of All Nations are so similar to her Faithful Friends and Little Ones dolls as to constitute trade dress infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Minn.Stat. §§ 325D.44 and 325F.13.[6] Unimax and Brass Key argue that Ott has no protectable trade dress because her dolls have no identifiable or tangible common features. In response, Ott argues that all of her dolls share a "signature look" readily identifiable by doll collectors and other consumers familiar with her work. Ott asserts that Unimax and Brass Key directly copied and imitated her dolls, such that her "signature look" was captured in its dolls.

Section 43(a) of the Lanham Act creates a federal claim for trade dress infringement. 15 U.S.C. § 1125(a)(1); *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990). "The trade dress of a product is the total image of a product, the overall impression created, not the individual features." *Woodsmith,* 904 F.2d at 1247 (citing *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir.1987)). Although trade dress infringement historically included only the packaging of a product, it has been expanded to encompass the design or appearance of the product itself. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 214–15,

---

**6.** In Count IV of her Complaint Ott also alleges that Unimax's and Brass Key's trade dress violations constitute common law unfair competition. Because Count IV is without independent, separate basis, and is therefore duplicative of other Counts in Ott's Complaint, the Court summarily dismisses Count IV. *See* *LensCrafters, Inc. v. Vision World, Inc.,* 943 F.Supp. 1481, 1490–91 (D.Minn.1996) (holding that where a common law unfair competition claim is "duplicative of another Count in the Complaint, the claim for unfair competition cannot stand.").

120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *see also Am. Greetings Corp. v. Dan–Dee Imps., Inc.,* 807 F.2d 1136, 1140–41 (3d Cir.1986).

■ In order to establish that her claimed trade dress is entitled to protection, Ott must prove that: (1) the trade dress is primarily nonfunctional; (2) it is inherently distinctive or has acquired distinctiveness through secondary meaning; and (3) its imitation would result in a likelihood of confusion as to the source of the dolls in the minds of consumers. *Insty* Bit, Inc. v. Poly–Tech Indus., Inc.,* 95 F.3d 663, 667 (8th Cir.1996). Whether each element is satisfied is a question of fact. *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 868 (8th Cir.1994).

a. *Functionality*

■ Trade dress is nonfunctional and thus protectable "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." *Aromatique,* 28 F.3d at 873. In determining functionality, the Court must view the design elements as a whole, not individually. *Rainforest Cafe, Inc. v. Amazon, Inc.,* 86 F.Supp.2d 886, 894 (D.Minn.1999). If a feature or a combination of features of a product is functional, it is not protected and may be copied by competitors in the marketplace, even if such imitation will cause consumer confusion. *See Dan–Dee,* 807 F.2d at 1141. On the other hand, if a competitor can effectively compete without copying a particular feature or combination of features, the trade dress is nonfunctional. *Rainforest Cafe,* 86 F.Supp.2d at 894.

In this case, Unimax and Brass Key argue that Ott's claimed trade dress, her "signature look," is essentially the realistic look of the dolls, which is itself functional and therefore not protectable. Ott does not, however, seek protection for her dolls on the basis that they are realistic. Rath-

er, Ott argues that the essence of her particular realistic-looking doll design has been captured by Unimax and Brass Key. She points to the following features in her dolls, which, in combination, create her signature look: soft bodies, darker skin pigmentation, hand painted eyes, high quality construction, realistic features, and overall facial design. (Pls.' Mem. in Opp'n Unimax's Mot. for Sum. J. at 9–10.) While Ott's description of her trade dress could be more specific, the Court is unable to find that the trade dress is functional as a matter of law. Ott herself acknowledges that other competing doll manufacturers have adopted different aesthetic design features for their realistic-looking 12 inch and 18 inch dolls. (*See id.* at 24; Pls.' Mem. in Opp'n Brass Key Mot. for Sum. J. at 23–24.) In addition, she has presented unrebutted testimony that her dolls have an overall aesthetic appeal that is unique enough to be recognized without the display of her trademark. (*See* Sanders Aff. ¶¶ 3–4; Heyerdahl Aff. at 2; Coffey Aff. ¶ 5; Kokesch Aff. ¶ 5; Jaslof Dep. at 52–53, 78–79; Howell Aff. ¶ 5; Wiedman Aff. ¶ 3; Moudree Aff. ¶ 2; Sullwold Aff. ¶ 3; Dasmann Aff. ¶ 2.) Moreover, the Court notes that collectible dolls, by their very nature, are purchased for their aesthetic value. (*See* Abramson Aff., Ex. M2.) Therefore, categorically labeling Ott's realistic-looking dolls functional as a matter of law would ignore the inherently nonfunctional aspects of her dolls' appeal. Thus, the Court finds that a genuine issue of material facts exists as to whether her Little Ones and Faithful Friends doll designs are functional. Unimax and Brass Key are not entitled to summary judgment on this issue.

b. *Distinctiveness*

■■ Trade dress is distinctive and capable of being protected if it is inherently distinctive or has acquired distinctiveness

through secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Ott does not allege that the trade dress of her dolls is inherently distinctive.[7] Thus, the sole concern relating to this element is whether the trade dress of her dolls has acquired distinctiveness through secondary meaning. Trade dress acquires secondary meaning when "in the minds of the public, the primary significance of the [trade dress] is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211, 120 S.Ct. 1339 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Ott has presented evidence that at least within the collectible doll industry, including consumers of collectible dolls, her designs are readily identified as Ott dolls. (*See* Sanders Aff. ¶¶ 3–4; Heyerdahl Aff. at 2; Coffey Aff. ¶ 5; Kokesch Aff. ¶ 5; Jaslof Dep. at 52–53, 78–79; Howell Aff. ¶ 5; Wiedman Aff. ¶ 3; Moudree Aff. ¶ 2; Sullwold Aff. ¶ 3; Dasmann Aff. ¶ 2.) Unimax and Brass Key have not rebutted such evidence, but instead argue that because the general public is unfamiliar with her trade dress, secondary meaning has not attached.

To establish secondary meaning, the trade dress user must show by exclusive and extensive use in the sale of its goods, "the [trade dress] has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Aromatique*, 28 F.3d at 870. Trade dress users can prove second-

ary meaning through direct evidence which includes consumer surveys and testimony of consumers or through circumstantial evidence, which includes deliberate copying of the mark. *Id.; Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed.Cir.1994). Deliberate copying of the mark may raise an inference of secondary meaning. *Aromatique*, 28 F.3d at 870. However, where there is a demand for the product, "capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning." *Id.*

In this case, Ott has presented both direct and circumstantial evidence to demonstrate that Ott's trade dress is recognized by the relevant consumer group. First, as noted above, Ott has presented several affidavits in which doll collectors attest to the distinctively recognizable look of Ott's dolls. Second, Ott has presented evidence that Target customers purchased Liberty Landing dolls and Dolls of All Nations, believing them to be Ott dolls, despite the differences in packaging. (*See* Sullwold Aff. ¶¶ 6–7; Abdo Aff. ¶¶ 4–9; Ott Dep. at 814; Heyerdahl Aff. at 2.) Finally, there is also evidence that Unimax and Brass Key directly copied Ott's Little Ones and Faithful Friends collections without conspicuously placing their trademarks on their products. Although packaged differently than Ott's dolls, the packages containing Dolls of All Nations and Liberty Landing dolls did not prominently display their sources. *Compare Aromatique*, 28 F.3d at 871 (holding that the

---

7. Had she made such a contention, it would have been unavailing. In *Wal-Mart*, 529 U.S. at 212, 120 S.Ct. 1339, the Supreme Court held that trade dress claims based on product design require a finding of secondary meaning because product design cannot be inherently distinctive. The Court reasoned that,

 In the case of product design, as in the case of color, we think consumer predisposition

to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs-such as a cocktail shaker shaped like a penguin-is intended not to identify the source, but to render the product itself more useful or more appealing.

 *Id.*

defendants' deliberate copying did not support an inference of secondary meaning because the defendants conspicuously placed its trademark on the product). In total, Ott has produced enough evidence to create a genuine issue of material fact as to whether the "signature look" of the Ott dolls have acquired secondary meaning.

### c. *Likelihood of Confusion*

In order to find that a likelihood of confusion exists, "there must be a substantial likelihood that the public will be confused." *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir.1998) (quoting *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1329 (8th Cir.1984)). While actual confusion is not essential to proving likelihood of confusion, the mere possibility of confusion is not enough. *Id.* In determining whether a likelihood of confusion exists, the Court considers: (1) the strength of the owner's trade dress; (2) the similarity between the owner's trade dress and the alleged infringer's trade dress; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the owner; (5) incidents of actual confusion; and (6) the type of product, its costs, and conditions of purchase. *Insty\* Bit*, 95 F.3d at 667. No factor is determinative, rather they represent a guide to determine if a reasonable jury could find that a likelihood of confusion exists. *Id.* at 670.

After reviewing the evidence and weighing the relevant factors, the Court concludes that there is a genuine issue of material fact as to likelihood of confusion. First, there is evidence that Ott's trade dress is strong. Strong trade dress can be shown through favorable reviews in magazines, nationally televised programs, and extensive advertising. *Rainforest Cafe*, 86 F.Supp.2d at 898. In this case, the strength of Ott's trade dress is evinced by the plethora of articles and advertisements in doll magazines about Ott and her unique designs, her numerous doll industry awards, her customary appearances at international toy shows, Target's own national advertising promoting her fame, and strong consumer recognition. (*See* Abramson Aff., Ex. B.)

Second, there are similarities between Ott's Little Ones and Faithful Friends and Unimax's Dolls of All Nations and Brass Key's Liberty Landing dolls, respectively. "Similarity of the [trade dresses] ... must be considered as they are encountered in the marketplace. Although similarity is measured by the [trade dresses] as entities, similarities weigh more heavily than differences." *Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 (8th Cir.1982) (quoting *Alpha Indus. v. Alpha Steel Tube & Shapes*, 616 F.2d 440, 444 (9th Cir. 1980)). "Similarity of trade dress is determined by the overall impression of a trade dress as a whole, rather than through a comparison of the individual features." *Rainforest Cafe*, 86 F.Supp.2d at 898. In this case, a reasonable jury could conclude that the overall impression of the features of Unimax's and Brass Key's dolls are substantially similar to the overall features of Ott's dolls. As previously noted, Ott has presented substantial evidence that consumers and doll collectors found Unimax's and Brass Key's dolls to be confusingly similar.

Third, there is evidence that at least Ott's Faithful Friends collection and Brass Key's Liberty Landing collection were in direct competition. The two collections were similarly priced, incorporated a similar theme, were located side-by-side on Collector's Lane, and were both sold exclusively at Target. Although Ott's Little Ones were not sold at Target alongside the Dolls of All Nations, it is not clear that the two collections were not in competition.

They were, after all, identically sized dolls based on the same international theme. Nevertheless, even a finding that the Little Ones dolls and the Dolls of All Nations were not in direct competition does not require the entry of summary judgment in favor of Unimax. *See id.* at 899 ("Direct competition requires a lesser degree of showing to establish likelihood of confusion than products not in direct competition with one another."). Therefore, on balance, this factor weighs against the entry of summary judgment on the issue of likelihood of confusion.

Fourth, there is a genuine issue of material fact as to whether Unimax and Brass Key intended to pass off their dolls as Ott dolls. This factor involves a two step inquiry addressing: (1) intent; and (2) passing off. *Id.* Thus, even if the alleged infringer deliberately or intentionally copied the trade dress of another, a finding of intent to pass off is inappropriate "if the alleged infringer clearly represents to the ultimate consumer that its products and trade dress are unique and distinct from those of the other." *Id.* Ott has presented evidence that at the direction of Target, Unimax and Brass Key obtained copies of Ott dolls for the purpose creating knock-offs. Furthermore, the Dolls of All Nations and Liberty Landing dolls did not conspicuously display their manufacturers' mark. Instead, the name of the manufacturer was placed in small print on the bottom or back of the box. Based on this evidence, a reasonable jury could find that Unimax and Brass Key not only deliberately copied Ott's dolls, but also that they intended to pass off their dolls as Ott dolls.

Fifth, there is undisputed evidence that consumers were actually confused about the source of Unimax's and Brass Key's dolls. "While actual confusion is not essential to a finding of trade dress infringement, . . . it does provide positive evidence of a likelihood of confusion." *Id.* at 900.

As previously discussed, Ott has documented several instances in which Target customers bought Dolls of All Nations and Liberty Landing dolls believing them to be Ott dolls. In fact, Target employed line monitors during Ott's doll signings to ensure that those customers holding Dolls of All Nations or Liberty Landing dolls did not give them to Ott to sign. (See Sullwold Aff. ¶ 6–7.) In addition, as recently as November 2, 2000, sellers on the Internet auction site eBay.com misidentified Dolls of All Nations as Ott creations. (*See* Niles Supp. Aff. Ex. 25.) The Court is well aware that actual confusion is not conclusive as to the existence of a likelihood of confusion. *See Woodsmith,* 904 F.2d at 1249. Nevertheless, the Court finds that there is sufficient evidence of actual consumer confusion to raise a genuine issue as to this factor.

Finally, the Court has considered the type of product in issue, its costs, and conditions of purchase. The essential inquiry here is "whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion." *Rainforest Cafe,* 86 F.Supp.2d at 903 (quoting *Swisher Mower & Machine, Inc. v. Haban Mfg., Inc.,* 931 F.Supp. 645 (W.D.Mo.1996)). In other words, a finding that the product is inexpensive and not the kind a consumer would devote inordinate time and attention in making a purchasing decision weighs in favor of a conclusion that a likelihood of confusion exists. *Id.* In this case, the products in issue, ranging in price from $10.00 to $39.00, were relatively inexpensive. Furthermore, Target customers were required to individually remove the dolls for purchase from the shelves. Given the similarities between the dolls and the arguably confusing shelving of the dolls discussed more fully below, a consumer looking for an Ott doll who did not devote significant time to the purchasing decision could very well have been confused about

the source of the dolls. Indeed, the evidence shows that Target customers purchase-or almost purchase-either Dolls of All Nations or Liberty Landing dolls, believing them to be Ott dolls. (*See* Sullwold Aff. ¶¶ 6–7; Abdo Aff. ¶¶ 4–9; Ott Dep. at 814; Heyerdahl Aff. at 2.)

In summary, after reviewing the evidence, including the dolls in issue, the Court is not convinced that Ott's claim of trade dress infringement fails as a matter of law. Accordingly, Unimax's and Brass Key's Motions for Summary Judgment are denied on this issue.

### 2. *Trademark Dilution*

For the reasons discussed below in the context of Target's Motion for Summary Judgment, Ott's trademark dilution claim against Unimax and Brass Key is dismissed. In addition, the Court notes that there has been no evidence presented that either Unimax or Brass Key actually made commercial use of Ott's trademark. As such, Ott's claim of trademark dilution against them is inappropriate. Count II of Ott's Complaint is dismissed as to Unimax and Brass Key.

### 3. *Unjust Enrichment and Quantum Meruit*

█ Finally, Unimax and Brass Key contend that Ott's claim of Unjust Enrichment and Quantum Meruit must be dismissed as preempted by the Copyright Act, 17 U.S.C. § 301 (the "Act"). "The Copyright Act provides the exclusive source of protection for 'all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of the copyright as specified in [the Act].'" *Nat'l Car Rental Sys., Inc. v. Computer Assocs., Int'l, Inc.,* 991 F.2d 426, 428 (8th Cir.1993) (quoting 17 U.S.C. § 301(a)). A state claim is preempted by the Act if:

(1) the work in issue is within the subject matter of copyright; and (2) the state-law-created right is equivalent to any of the exclusive rights within the general scope of the Act. *Id.* The Act "grants to the copyright owner the exclusive right to reproduce the copyrighted work, prepare derivative works and to distribute copies of the work." *CSM Investors, Inc. v. Everest Dev., Ltd.,* 840 F.Supp. 1304, 1314 (D.Minn.1994).

█ Ott does not dispute that her dolls are within the subject matter of copyright. Thus, to the extent that Ott bases her unjust enrichment and quantum meruit claims on Unimax's and Brass Key's distribution and copying of her dolls, those claims are preempted. *See Zimmerman Group, Inc. v. Fairmont Foods of Minnesota, Inc.,* 882 F.Supp. 892, 895 (D.Minn. 1994) (finding preemption of unjust enrichment claim where it was based on acts of copyright infringement). In the Complaint, Ott alleges simply that: "By failing to compensate Plaintiffs for the use of their dolls and designs, Defendants have been unjustly enriched at the expense of Plaintiffs." (Compl.¶ 88.) This allegation sounds squarely in copyright infringement. Accordingly, based on the language contained in the Complaint, Ott's claim of unjust enrichment and quantum meruit are dismissed.

### C. **Target's Motion**

#### 1. *False Advertising*

In Counts III though VII of the Complaint, Ott alleges that Target violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law unfair competition laws,[8] and Minn.Stat. §§ 325D.44, 325D.13, and 325F.67 by promoting, advertising, and selling Heidi Ott knock-offs, using the

---

**8.** As above, Count IV of the Complaint is dismissed against Target as duplicative of Counts III, V, VI, and VII. *See Supra* n. 6; *LensCrafters,* 943 F.Supp. at 1490–91.

Heidi Ott mark to improperly enhance the value of Target's Collector's Lane, and improperly using photographs of Ott to market non-Ott dolls. (*See* Compl. ¶¶ 74–81.) Section 43(a) of the Lanham Act proscribes the false designation of a product's origin and false descriptions of products.[9] *See* 15 U.S.C. §§ 1125(a)(1). "The underlying purpose of § 43(a) is to protect both consumers and competitors from a wide variety of misrepresentations of products and service, implicating 'a broad spectrum of marks, symbols, design elements and characters.' " *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 92 n. 13 (2d Cir.1984) (quoting *Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir. 1981) and *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.Supp. 619, 623 (S.D.N.Y.1981)).

At the outset of this discussion it should be noted that this is not a typical false advertising case. This is not, for example, a case in which the defendant made direct or indirect comparisons of its products with those of the plaintiff. *See, e.g., Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir.2000), *petition for cert. filed,* —— U.S. ——, 121 S.Ct. 1355, 149 L.Ed.2d 285 (2001) (discussing advertisement comparing pizza quality and taste); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1331 (8th Cir.1997) (discussing advertisement comparing the effectiveness of industrial filters). Nor does it involve a defendant falsely advertising the "characteristics" of its or another's product. *See, e.g., Rhone–Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514 (8th Cir.1996) (advertisement falsely indicating that the plaintiff's drug may be substituted for the defendant's drug); *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F.Supp.2d 1016, 1025 (D.Minn.2000) (advertisement stating that certain wines would be in stock and available when they were either not in stock or in stock in extremely small quantities). Rather, this case involves a retailer, Target, that is alleged to have orchestrated the creation, promotion, and sale of Heidi Ott® knock-offs in such a manner that the consuming public was led to believe that the knock-offs were in fact Ott products. This scheme was not only dependent on Target's alleged misconduct, but also on the complicity of the knock-offs' manufacturers, Unimax and Brass Key. Simply put, if Unimax and Brass Key had not created dolls directly modeled after Ott's Little Ones and Faithful Friends collections, Target's allegedly misleading marketing is not likely to have resulted in consumer confusion as to the source of the dolls. Indeed, Ott does not claim that Target's similar promotion of other dolls displayed on Collector's Lane constituted false advertising. Her concern is only with those dolls that bear a striking resemblance to her own: the Liberty Landing dolls and the Dolls of All Nations.

---

9. The statute provides in relevant part:

 Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

 \* \* \* \* \* \*

 (B) in commercial advertising or promotion, misrepresents the nature, charac-teristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

In order to establish a false advertising claim under the Lanham Act and related state statutes, Ott must prove that: (1) Target made a false statement of fact about its own or Ott's product in a commercial advertisement; (2) the statement actually deceived or tended to deceive a large segment of its audience; (3) the deception was likely to influence buying decisions; (4) Target caused the false statement to enter interstate commerce; and (5) Ott has been injured as a result of the false statement. *Blue Dane Simmental Corp. v. Am. Simmental Ass'n,* 178 F.3d 1035, 1042–43 (8th Cir.1999); *see also LensCrafters,* 943 F.Supp. at 1488 ("In evaluating any claims that are brought under both the State and Federal [false advertising] Statutes, the Court applies the same analysis.").[10] Each element in issue will be discussed separately.

### a. *False Statement of Fact*

A plaintiff may satisfy this burden by demonstrating that the defendant either made literally false statements of fact or literally true statements of fact that were likely to mislead consumers. *LensCrafters,* 943 F.Supp. at 1488. In this case, Ott alleges that Target engaged in both literally false advertising and true but misleading advertising.

Ott first claims that Target's use of the Ott placard constituted literally false statements. In order to be deemed literally false the statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut,* 227 F.3d at 496 (quoting *Coastal Abstract Serv., Inc. v. First Am. Title*

*Ins. Co.,* 173 F.3d 725, 731 (9th Cir.1999)). In determining whether a statement is literally false, "a court must analyze the message conveyed in full context." *Rhone–Poulenc,* 93 F.3d at 516 (quoting *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3d Cir.1993)). For example, "[t]he greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion ... the less likely it is that a finding of literal falsity will be supported." *United Indus. Corp. v. The Clorox Co.,* 140 F.3d 1175, 1181 (8th Cir.1998).

In this case, Target's use of the Ott placard must be assessed in the two different contexts in which it appears to have been used. In the first, only Faithful Friends dolls were placed behind the placard bearing Ott's mark and likeness. In the second, non-Ott dolls were placed behind the Ott placard. Clearly, Target's use of the Ott placard in the first instance cannot be found to be literally false because the placard accurately represented that the dolls directly behind it were Ott dolls. However, in the second instance, a reasonable jury could find that the Ott placard constituted a literally false statement. The explicit factual message conveyed by the placard was that dolls placed behind it were Ott dolls. Ott has presented concrete evidence that in at least one store, unboxed Liberty Landing dolls as well as other unboxed dolls were placed behind the Ott placard. (*See* Niles Aff., Ex. 8.) Thus, the placard's representation that the dolls were created by Ott doll was "capable of being proved false [and] of being reasonably interpreted as a statement of objective fact." *Pizza Hut,* 227

---

**10.** Ott's claim under Minnesota Statutes Section 325F.67 has different elements than the Ott's other false advertising claims. In order to prevail on this Count, Ott must establish: (1) intent; (2) publication; (3) a false or misleading advertisement; and (4) damage. *Lens-*

*Crafters,* 943 F.Supp. at 1491; *see also* Minn. Stat. §§ 325F.67, 8.31. Because each element in issue is discussed in the context of Ott's other false advertising claims, the Court will not discuss this count separately.

F.3d at 496. The Court rejects Target's argument that simply having a non-Ott doll behind the Ott placard is insufficient as a matter of law to prove literal falsity. Because the determination of whether a statement is literally false is an issue of fact requiring contextual analysis, the question is properly left to the jury. *See LensCrafters*, 943 F.Supp. at 1488.

■ Although Ott's claim of literal falsity with respect to Target's use of the placard is sufficient to survive summary judgment, the Court rejects Ott's claim of literal falsity insofar as she relies on Target's alleged understocking of her dolls. Although Ott correctly notes that understocking can be the basis for a finding of literally false advertising, *see Surdyk's*, 83 F.Supp.2d at 1025, this is not such an instance. In *Surdyk's*, the plaintiff challenged the defendant's wine sale advertisement, which listed stock numbers, sales prices, and descriptions of the sale wine. *Id.* at 1024. The advertisement further indicated that the wines listed would be "immediately available" at the locations indicated therein. *Id.* Upon investigating the availability of the wine advertised, the plaintiff found that a number of the wines were either completely out of stock or stocked only small bottle quantities. *Id.* at 1025. The court concluded that the plaintiff was likely to succeed in proving literal falsity because the actual inventory in the defendant's stores "directly contradict[ed]" the defendant's advertised claims. *Id.*

In this case, Target did not engage in advertising similar to the defendant in *Surdyk's*. No Target advertisement indicated that Ott's dolls would be "immediate-

ly available." In addition, apart from the advertising relating to the test market, Target never indicated to the public that Ott dolls would be available at specific stores at specific times and in specific quantities. This Court will not read *Surdyk's* so broadly as to include general understocking, without more, within the realm of false advertising.

■ Ott also alleges that the advertisements and in-store promotions of Faithful Friends, the Dolls of All Nations, and Liberty Landing dolls, even if literally true in some contexts, were executed in such a way that consumers were led mistakenly to believe that they were Ott dolls. After carefully reviewing the record, the Court believes that the evidence presented by Ott raises a legitimate question as to whether Target's promotion of the dolls in question was literally true but misleading. In particular, the Court notes Target's use of an unidentified Ott doll to advertise Collector's Lane furniture,[11] the aforementioned use of the Ott placard, the fact that Faithful Friends and Brass Key's Liberty Landing dolls were interspersed on the shelves below display cases bearing Ott's placard, and the fact that in at least one instance a Liberty Landing doll was actually sold in an Ott box. (*See* Niles Aff., Ex. 8; Patti Dep. at 8–10, 42.) In addition, while not sufficient in itself to constitute a literally false statement, the alleged understocking in this case could have contributed to consumer confusion as to the source of the dolls in issue.[12] Finally, given the intentional similarities between the dolls and the fact that the Ott look-alikes were sold in packages that did not

---

**11.** Although the advertisement did not directly misidentify the doll as a Liberty Landing or other doll, it was also not identified as a Heidi Ott® doll.

**12.** The Court notes that Target received a staggering number of consumer complaints

about the understocking of Ott's dolls, (*see* Abramson Supp. Aff. W1), which tends to contradict Ott's allegations that the understocking led consumers to believe that Liberty Landing dolls were Ott dolls. Nevertheless, the issue remains one for the jury.

readily identify the dolls' manufacturers, consumers could have been misled into believing that the non-Ott dolls were in fact Ott dolls. At a minimum, there is a genuine issue as to whether Target's promotion of the dolls was misleading. Accordingly, Target's Motion for Summary Judgment cannot be granted in this respect.

■ Ott also argues that Target engaged in misleading advertising by methodically co-branding the Ott brand with Target's own Collector's Lane brand. According to Ott's expert, Deborah Roedder John, Ph.D. ("John"), "[c]o-branding is a marketing strategy where two or more brand names are used to identify a product or service." (John Expert Report at 13.) It essentially involves the "marriage of two or more brands." (*Id.*) John opines that Target used a "co-branding strategy for marketing Collector's Lane that involved the unauthorized use of the Heidi Ott® brand." (*Id.* at 14.) Specifically, "Target used the Heidi Ott® name (itself a registered trademark), picture, and dolls in combination with the Collector's Lane brand name and logo in a way that, in effect, co-branded the Heidi Ott® brand with the Collector's Lane brand." (*Id.*) John concluded that as a result of Target's co-branding strategy, "it is reasonable that consumers would infer that Heidi Ott was the designer of all dolls in Collector's Lane." (*Id.* at 17.) John also concluded that as a consequence of Target's co-branding scheme, the good will of Ott's business has suffered irreparable damage. (*Id.* at 21–24)

This theory is certainly interesting and the Court does not doubt Ms. John's qualifications. Nevertheless, whether Ott has generally presented a credible claim of false advertising based on her theory of co-branding need not be determined. As argued by Target, there is conclusive undisputed evidence that Ott acquiesced, both directly and through Julie Abdo, to Target's use of the Collector's Lane mark in conjunction with her own. (*See* Abdo Aff. ¶¶ 10, 12–14.) That Target's use of the Collector's Lane mark may have ultimately had results unforeseen by Ott will not save her theory of co-branding. The fact remains that at all relevant times, Ott authorized and even encouraged Target to use the marks in conjunction with one another. (*See id.*) In addition, since 1996, Target has built up its collectible doll and doll accessory offerings around the use of the Collector's Lane mark such that it would be unjust to require Target to stop using the mark. Moreover, the Court is mindful that the mark in issue is not Ott's mark, but Target's registered service mark. Restricting Target's ability to use its own mark would be an extreme remedy under any circumstances. Accordingly, the Court concludes that Ott's co-branding theory is equitably barred by the doctrine of acquiescence.[13] *See Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 & n. 3 (5th Cir.1985) (approving a jury's finding of acquiescence where plaintiff knew of defendant's use of its mark, impliedly authorized the use of the mark, and after receiving plaintiff's authorization defendant built up its business using the mark).

---

**13.** The issue of co-branding is distinct from the issue of whether Target impermissibly used the Ott mark to sell non-Ott dolls. While Ott may have acquiesced to Target's use of the Collector's Lane mark, the Court is unable to find as a matter of law that she acquiesced to the questionable use of her own mark. There is ample evidence in the record that she complained to Target when she became concerned with its use of her mark. (*See* Ott Dep. 790–93, 785–87, 841–42; Abdo Aff. ¶ 14; Abramson Aff., Ex. H72.) However, there has been no evidence presented that she ever complained about Target's use of the Collector's Lane mark in conjunction with her own.

### b. *Consumer Confusion*

██ Although formally an element of Ott's prima facie case, whether Ott will ultimately bear a burden of proof as to consumer confusion depends on whether the jury finds the statements in issue to be literally false or literally true but misleading. If the statements of fact in issue are found to be literally false, Ott will be relieved of the burden of establishing that the consuming public was actually misled by the false statement. *LensCrafters,* 943 F.Supp. at 1488. The same presumption of deception will attach to true but misleading statements if the jury concludes that Target acted deliberately to deceive consumers. *Porous,* 110 F.3d at 1333.

As previously discussed, there are genuine issues of material fact as to whether the statements in issue were literally false. In addition, Ott has presented ample evidence beyond mere conjecture from which a jury could conclude that Target's conduct was deliberate. First, as previously discussed, there is at least a genuine issue of material fact as to whether Target instructed Unimax and Brass Key to make knock-offs of Ott's dolls. Second, there is evidence that Target failed to follow its own explicit written policies regarding the handling of the intellectual property rights of others. For example, when faced with Ott's accusations of infringement, rather than immediately notifying Target's legal department and determining whether the accused vendor's account should be placed on hold, (*see* Abramson Aff., Ex. V), Target did basically nothing. When Ott confronted Target about the striking similarities between her Little Ones and the Dolls of All Nations, Target did not investigate the matter, but merely assured her that future Dolls of All Nations would not be similar. Likewise, when confronted about the similarities between the Liberty Landing dolls and her Faithful Friends collection, Target did nothing but refer the matter to Brass Key. While these could have been a mere lapses in usual procedure, the consistency with which Target failed to follow its own regulations when dealing with Ott suggests something more deliberate. Thus, the Court cannot conclude as a matter of law that the presumptions do not apply. This is ultimately a question for the jury.

### c. *Proof of Causation and Injury*

██ As with consumer confusion, a presumption of causation and injury sufficient to entitle the plaintiff to damages will arise if the defendant deliberately engaged in deceptive comparative advertising. *Porous,* 110 F.3d at 1336. On the other hand, no proof of actual injury is required for injunctive relief. *Id.* The reason for this distinction was explained by a leading commentator:

> Since § 43(a) was passed to protect consumers as well as competitors, the courts are not and should not be reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of provable impact on the plaintiff may be subtle and slight. Congressional policy appears to encourage commercial firms to act as the fabled 'vicarious avenger' of consumer rights. An injunction, as opposed to money damages, is no windfall to the commercial plaintiff. An injunction protects both consumers and the commercial plaintiff from continuing acts of false advertising. Money damages, on the other hand, primarily aid only the competitor, and he is required to satisfy a much higher standard of proof as to injury in order to recover damages.

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.04(3)(d) (3rd ed.1996) (footnotes omitted).

Because the proposed remedy dictates the standard that will apply with respect to proof of injury, the Court must first ascertain the precise relief sought by Ott. Based on a review of the Complaint and Ott's memoranda of law, it is quite clear that Ott seeks both injunctive relief and money damages in this case. In particular, Ott seeks to require Target to engage in corrective advertising to rectify consumer confusion caused by Target's alleged misrepresentations. (Pls.' Mem. in Opp'n Target's Mot. for Sum. J. at 17.) Target argues that Ott's relief should be limited to money damages because there is no remaining injunctive relief available to her. While it is true that Target has not carried Ott dolls since 1999 and that no Ott placards remain in any Target stores, the Court is not convinced that injunctive relief is an inappropriate remedy in this case, particularly in light of the fact that as recently as November 2, 2000, sellers on the Internet auction site eBay.com misidentified Dolls of All Nations as Ott creations. (*See* Niles Supp. Aff. Ex. 25.) Inasmuch as Target may have contributed to the confusion surrounding the dolls in question, Ott's request for corrective advertising is neither legally nor factually inappropriate. *See Rhone–Poulenc*, 93 F.3d at 516 (approving corrective advertising as a method of injunctive relief to counter defendant's false advertising relating to the capabilities of plaintiff's drug). Thus, the Court will not limit the forms of relief available to Ott in this case.

 To the extent that Ott seeks injunctive relief, she has indeed established the minimum necessary to proceed to trial. Whether Ott may also proceed on her claim of damages is another, more complicated matter. Again, in order for the presumption of injury to arise where damages are sought, the plaintiff must establish that the defendant deliberately engaged in deceptive comparative advertising. *Porous*, 110 F.3d at 1336; *see also Ortho*

*Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir.1994) (disfavoring "presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any competitor's products."). As previously discussed, this case does not involve comparative advertising. According to Target, this fact renders the presumption of injury inapplicable. For her part, Ott acknowledges that this is not a comparative advertising case. However, she argues that the *Porous* presumption should be extended to apply in cases such as this where particular products are involved.

In resolving this issue, the Court finds instructive the reasons supporting the distinction based on the type of advertising involved. As explained by the Eighth Circuit,

> In a suit for money damages where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may only be one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage.

*Porous*, 110 F.3d at 1335–36. Despite Target's protestations to the contrary, the Court does not believe that an award of damages in this case would result in a windfall to Ott. Ott's complaint is not a generalized grievance about Target's promotions and advertising. Rather, Ott claims that Target's advertising both directly and indirectly misled consumers to believe that Liberty Landing dolls and the Dolls of All Nations were manufactured by Ott. This claim does not involve other collectible doll manufacturers. Indeed, as previously noted, Ott's false advertising claim is dependent on the similarities between the above-identified dolls. As such, Ott, rather than collectible doll manufac-

turers generally, was injured by Target's alleged misconduct, and an award of damages based on Target's conduct would not result in a windfall to Ott. The Court therefore concludes that the presumption of causation and injury applicable to cases involving comparative advertising applies with equal force in this case. That being decided, the Court further concludes that, as with the presumption of deception, Ott has raised genuine issues of material fact as to whether the prerequisites of this presumption have been met.

In summary, notwithstanding the somewhat atypical aspects of this case, Defendants' alleged conduct appears to fall within the purview of state and federal false advertising statutes. Whether Defendants should actually be found liable under the statutes is of course another matter entirely, left solely to the jury.

### 2. Target's Use of Ott's Trademark and Likeness

Ott alleges that Target "deliberately used and willfully and maliciously promoted the [Heidi Ott] mark in interstate commerce to sell dolls and goods related to dolls which are not manufactured by or affiliated with Heidi Ott A.G.," (Compl.¶ 60), in violation of trademark infringement laws and the common law right to publicity. Target argues only that it cannot be held liable for trademark infringement or violation of Ott's right to publicity because as a retailer selling her products, it had the right to use her mark and likeness. While it is true that Target may not be held liable for using Ott's mark and likeness to sell her goods, it certainly may be liable for using the mark and likeness to sell non-Ott goods. *See Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co.*, 576 F.Supp. 1055 (E.D.N.Y. 1983) (finding a violation of § 43(a) of the Lanham Act where the defendants sold non-BaskinRobbins ice cream at a Baskin–Robbins outlet in Baskin–Robbins' cups).

Although Target denies having done so, there is a material factual dispute as to this issue.

In particular, the Court notes that Ott has presented undisputed evidence that Ott's mark was used to sell non-Ott dolls. For example, there is concrete evidence that in at least one Target store, an unboxed Liberty Landing doll was placed in a glass case on which the Ott placard was prominently displayed. (*See* Niles Aff., Ex. 8.) In addition, at least one Liberty Landing doll was sold in an Ott package. (*See* Patti Dep. at 8–10, 42.) Target maintains that these instances are merely discrete aberrations and therefore insufficient as a matter of law to constitute trademark infringement. The Court strongly disagrees. Faced with evidence that Target actually sold non-Ott dolls by using the Ott name and mark, whether by design or mistake, the Court is compelled to allow this case to go forward. Ultimately, whether Target's actions constituted trademark infringement or a violation of Ott's right to publicity will be determined by a jury. Thus, the Court denies Target's motion with respect to Ott's claims of trademark infringement and violation of the right to publicity. Target also argues that Ott's trademark and right to publicity claims fail because Ott acquiesced to its use of her mark and likeness. As previously discussed, there is sufficient evidence in the record that she complained to Target when she became concerned with its use of her mark. (*See* Ott Dep. 790–93, 785–87, 841–42; Abdo Aff. ¶ 14; Abramson Aff., Ex. H72.) The Court therefore cannot conclude as a matter of law that Ott acquiesced to Target's particular use of her mark and likeness.

### 3. Trademark Dilution

Trademark dilution is "separate and distinct from trademark infringe-

ment." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir.1999). "Infringement depends on a likelihood of consumer confusion over the source of a product, while dilution by blurring concerns 'the lessening of the capacity of a famous mark to identify and distinguish goods or services.' ". *Id.* In other words, the Federal Trademark Dilution Act ("FTDA") "creates a remedy against non-competing trademark uses such as 'DuPont shoes, Buick aspirin, and Kodak pianos.' " *Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 888 (8th Cir.1998) (quoting 141 Cong. Rec. H14317 (daily ed. Dec. 12, 1995) (statement of Rep. Moorehead)). To establish a claim of trademark dilution under the FTDA, 15 U.S.C. § 1125(c), Ott must show that her mark is famous, that Defendants began using the mark after it became famous, and that Defendants' use of the mark dilutes the distinctive quality of the mark by causing consumers to connect the mark with different products. *See Luigino's*, 170 F.3d at 832. Target argues that Ott's dilution claim must fail because at most the mark is famous within the niche market of doll collectors. Target asserts that protection of a mark not famous to the general public would give Ott "a virtual monopoly" over the mark. (Target Reply Mem. at 12.) In response, Ott maintains that a mark's high degree of fame within a niche market is sufficient to meet FTDA requirements.

As noted by the parties, the Eighth Circuit has not yet squarely addressed this issue, and there is an apparent split among courts that have weighed in on the issue. *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640 (7th Cir. 1999) (collecting cases).[14] After considering the arguments on both sides of the debate and reviewing Eighth Circuit law on the general subject of the FTDA, this Court adopts the view that, at least in this context, the niche-market theory is inconsistent with the purposes of trademark dilution law. The Court is particularly persuaded by Circuit Judge Barry's dissent in *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 174 (3d Cir.2000):

> If marks can be 'famous' within some market, depending on how narrowly that market is defined, then the FTDA will surely devour infringement law. Indeed, the unauthorized use of a mark in the same or a similar market is precisely what good old-fashioned infringement principles have traditionally been there to remedy once actual confusion or likelihood of confusion has been shown, and there is simply no need for dilution principles. Can one imagine a clearer case for application of those principles than if one were to begin manufacturing automobiles and calling those automobiles 'Buick'? . . . Congress was quite clear, however, that the FTDA was not designed for situations in which ordinary infringement law provided a remedy but, rather, for those situations in which a truly famous mark on dissimilar products deserves, but cannot receive, protection under infringement law-those sit-

---

**14.** The Seventh Circuit specifically found that: At an initial glance, there appears to be a wide variation of authority on this issue. Some cases apparently hold that fame in a niche market is insufficient for a federal dilution claim, while some hold that such fame is sufficient. However, a closer look indicates that the different lines of authority are addressing two different contexts. Cases holding that niche-market fame is insufficient generally address the context in which the plaintiff and defendant are using the mark in separate markets. On the other hand, cases stating that niche-market renown is a factor indicating fame address a context like the one here, in which the plaintiff and defendant are using the mark in the same or related markets.
*Syndicate Sales,* 192 F.3d at 640.

uations in which, for example, no one would ever confuse that truly famous mark with the goods or services to which it has been wrongly attached.

Furthermore, the Eighth Circuit has made clear that dilution laws are designed to protect marks from non-competing uses. *See Viacom,* 141 F.3d at 888. Because this case involves directly competing products, application of the niche-market theory would result in an over-extension of the protection afforded by the FDTA and would render trademark infringement laws duplicative. Indeed, based on the reasoning of Judge Barry, the FTDA categorically does not apply in this case, regardless of whether the niche-market theory is applied. Accordingly, Ott's trademark dilution claim fails as a matter of law.

### 4. *Promissory Estoppel* [15]

Finally, Ott claims that she is entitled to recover under the doctrine of promissory estoppel. Ott identifies three allegedly unfulfilled promises made by Pellegrene on behalf of Target: (1) the promise to "aggressively promote and advertise" her dolls; (2) the promise to buy one million Little Ones dolls for the Disney project; and (3) the promise to buy at least 200,000 Faithful Friends dolls per year. (Compl.¶ 90.) Target seeks summary judgment on Ott's promissory estoppel claim, arguing principally that the statute of frauds renders the alleged promises unenforceable. Pellegrene denies ever making any of the statements in question.

■ Importantly, "[p]romissory estoppel is the name applied to a contract implied in law where no contract exists in fact." *Starry Constr. Co., Inc. v. Murphy Oil USA. Inc.,* 785 F.Supp. 1356, 1367 (D.Minn.1992). "The effect of promissory estoppel is to imply a contract from a unilateral or otherwise unenforceable promise coupled by detrimental reliance on the part of the promisee." *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 230 N.W.2d 588, 593 (1975). In contrast, the statute of frauds operates to render unenforceable certain contracts not reduced to writing. *See* Minn.Stat. § 336.2–201(1) ("Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.").

In this case, Ott does not contend that the promises she relies on for her promissory estoppel claim formed the bases of actual contracts. Indeed, if she did, the doctrine of promissory estoppel would be "wholly inapplicable." *Starry Constr.,* 785 F.Supp. at 1367 (citing *Del Hayes & Sons,* 230 N.W.2d at 593). Thus, Target's statute of frauds defense, which pertains exclusively to contracts, is quite clearly inapposite. Nevertheless, Target points to specific language in several Minnesota cases in support of its position: "the doctrine of promissory estoppel [may] be used to take [a] contract out of the Statute of Frauds ... when the promise relied upon is a promise to reduce the contract to writing." *Lunning v. Land O'Lakes,* 303 N.W.2d 452, 459 (Minn.1980); *see also Starry Constr.,* 785 F.Supp. at 1365 n. 1 ("[P]romissory estoppel takes the contract out of the statute of frauds ... only when the promise relied upon is a promise to reduce the contract to writing."). Target interprets this language to mean that all promissory estoppel claims based on an

---

**15.** In her brief, Ott raises for the first time the doctrine of equitable estoppel. Because she did not plead that theory in her Complaint, it is not properly before the Court and will not be considered.

oral promise are barred by the statute of frauds unless the promise relied upon is a promise to reduce the contract to writing. (*See* Target Mem. in Supp. at 28.) The Court finds this interpretation untenable. The language relied on by Target relates to oral promises attendant to underlying oral contracts, rather than oral promises generally. In contrast, this case involves oral promises, not oral contracts. Thus, the statute of frauds has no bearing on this case whatsoever. Moreover, were the Court to adopt Target's reading of the language in question, the doctrine of promissory estoppel would be eviscerated. Target's statute of frauds defense therefore categorically fails.

■ Although Target devotes most of its time advancing its statute of frauds defense, it also questions the merits of Ott's promissory estoppel claim. Under Minnesota law, promissory estoppel applies to bind a promisor to:

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance ... if injustice can be avoided only by enforcement of the promise.

*Starry Constr.*, 785 F.Supp. at 1367 (quoting the Restatement (Second) of Contracts § 90). Target argues that Pellegrene's alleged promises to "aggressively promote and advertise" Ott's dolls is not sufficiently clear and definite to support a claim of promissory estoppel. *See Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992) (holding that a promise must be "clear and definite" in order to be enforced under the doctrine of promissory estoppel). The Court agrees. The words allegedly used by Pellegrene were simply too subjective and vague to have any specific meaning. Moreover, Ott admitted that she considered Pellegrene's bold statements about the promotion of her dolls to

be mere puffery. (*See* Ott. Dep. at 135–36.) Therefore, the Court grants summary judgment to Target insofar as Ott's claim is based on Pellegrene's promises relating to the promotion and advertising of her dolls. However, because Target does not challenge the merits of her claim relating to the two other promises, they remain a part of her claim.

Finally, Target argues that Pellegrene should be dismissed from this Count because he was acting solely on behalf of Target when he allegedly made the promises in issue. Given that Pellegrene is the only Target representative alleged to have made any of the statements in issue and that he has presented no compelling arguments or law supporting his dismissal, he shall remain a Defendant to this Count.

### D. Ott Motion for Partial Summary Judgment

#### 1. *Validity of Trademark*

Ott first seeks the entry of summary judgment as to the validity of her trademark registration. However, as argued by Defendants, a finding that Ott's trademark is valid and incontestable would not result in summary judgment. Rather, such a finding is only the first step in determining whether the mark was infringed upon. Consequently, the Court denies Ott's Motion for Summary Judgment with respect to this issue. *See Kendall McGaw Labs., Inc. v. Cmty Mem'l Hosp.*, 125 F.R.D. 420, 421 (D.N.J.1989) ("Summary judgment may be had as to one claim among many, but it is well settled that [Rule 56 does not] allow[ ] such a judgment as to one portion a claim.").

#### 2. *Affirmative Defenses*

Ott also seeks summary judgment on Defendants' affirmative defenses of laches, waiver, and equitable estoppel. After reviewing the facts and law relevant to the

defenses, the Court is satisfied that there are genuine issues of material fact precluding summary judgment in favor of Ott. Ott's Motion is therefore denied in this respect.

3. *False Advertising and Right to Publicity Claims*

Finally, Ott also seeks summary judgment as to her Right of Publicity and False Advertising claims against Target. As previously discussed in the context of Target's Motion, there are genuine issues of material fact precluding summary judgment as to those claims. As such, Ott's Motion must also fail on this ground.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, the Court grants in part and denies in part each Defendant's Motion and denies Plaintiffs' Motion.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Brass Key's Motion for Summary Judgment (Clerk Doc. No. 145) is **GRANTED IN PART AND DENIED IN PART;**

2. Unimax's Motion for Summary Judgment (Clerk Doc. No. 123) is **GRANTED IN PART AND DENIED IN PART;**

3. Target's Motion for Summary Judgment (Clerk Doc. No. 156) is **GRANTED IN PART AND DENIED IN PART;**

4. Counts II, IV, and IX of Ott's Complaint (Clerk Doc. No. 1) are **DISMISSED WITH PREJUDICE;** and

5. Ott's Motion for Partial Summary Judgment (Clerk Doc. No. 167) is **DENIED.**